**IN THE UNITED STATES DISTRICT**
**COURT NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISON**

| | | |
|---|---|---|
| KENNETH MARSHALL, | ) | CASE NO. 3:25-cv-01411-PAG |
| Petitioner, | ) | PATRICIA A. GAUGHAN<br>UNITED STATES DISTRICT JUDGE |
| v. | ) | MAGISTRATE JUDGE<br>REUBEN J. SHEPERD |
| WARDEN TOM WATSON, | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

## I. Introduction

On June 18, 2025[1], Petitioner Kenneth Marshall ("Marshall") filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF Doc. 1). On July 7, 2025, the matter was referred to me pursuant to Local Rule 72.2 for issuance of a report and recommended decision. (non-document entry of July 7, 2025). Warden Tom Watson ("Respondent") filed a Return of Writ, state court record, and transcripts with this Court on October 13, 2025. (ECF Docs. 10, 10-1, 10-2). Marshall filed his Traverse on November 11, 2025, making the Petition ripe for review. (ECF Doc. 12).

[1] Federal district courts apply the prison mailbox rule, accepting filings as of the date placed in the prison mail system. *See Houston v. Lack*, 487 U.S. 266, 270 (1988).

## II. Factual Background

The Ohio Sixth District Court of Appeals set forth the facts on direct appeal. These factual findings are presumed correct unless Marshall rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

> {¶ 3} On April 15, 2000, Toledo police responded to a possible homicide involving 19-year-old, C.L. It was later determined that C.L. was raped and strangled. On August 21, 2000, Toledo police received a sexual assault call where victim A.A., then 17 years old, stated that the suspect threatened her with a box-cutter or knife and vaginally raped her. Less than two months later, on October 2, 2000, S.S.-M., then 13 years old, reported to Toledo Police that an unknown individual forced her into a residential backyard performed oral sex on her and vaginally raped her.
>
> {¶ 4} Unknown DNA profiles were identified from the swabs collected from each victim. In early 2021, Marshall's DNA was confirmed as present in all three cases. Following the DNA match, the Grand Jury returned an indictment charging Marshall with aggravated murder, murder, rape, and felonious assault, with sexual motivation and repeat violent offender ("RVO") specifications (Counts 1-4, relating to C.L.); two counts of rape with RVO specifications (Counts 5-6, relating to A.A.); and three counts of rape with RVO specifications (Counts 7-9, relating to S.S.-M.).
>
> {¶ 5} On November 5, 2021, Marshall filed a motion for relief from prejudicial joinder, arguing that separate trials were warranted on the counts as to each individual because of the substantial danger that Marshall would be found guilty based on the jury's belief that he had a propensity to commit the alleged acts. The state countered that trying the counts jointly was proper as the evidence was simple and direct as to each incident and that the evidence would be admissible as proof of identity if the counts were tried separately. The state further argued that policy considerations, including judicial economy and inconvenience to witnesses, supported a joint trial. Agreeing with the state, on February 1, 2022, the trial court denied the motion.
>
> {¶ 6} The following evidence involving the murder and rape of C.L., and the rapes of A.A. and S.S.-M., was presented during a four-day jury trial.
>
> **A. C.L.**
>
> {¶ 7} E.L. testified that she and C.L. had been friends since high school. E.L. explained that C.L. and her boyfriend, Zeke, were involved in a "toxic" relationship, i.e. fighting and arguments, that C.L. was trying to terminate. The pair briefly lived together; C.L. moved out but Zeke still "stalked" her. E.L. admitted that C.L. was still getting money and gifts from Zeke that she would procure by occasionally having sex with him. E.L. stated that C.L. had performed as an exotic

dancer and, on occasion, "contracted" with clients for sex. According to E.L., for her safety C.L. would always let her know when, where, and who she was with. According to E.L., C.L. had no planned arrangements around the time of her death. E.L. noted C.L.'s strong opposition to having sex with two different men on the same day.

{¶ 8} On August 14, 2000, around 12:00 p.m., E.L. testified that she and C.L. met at C.L.'s apartment on Robinwood Avenue in central Toledo. They immediately left in C.L.'s new Jeep to drive around and "show it off." While out, they stopped in north Toledo at C.L.'s mother's house and said hello to her neighbor, A.P.

{¶ 9} The pair returned to C.L.'s apartment to get ready to go out for the evening. They left the house at approximately 6:30-7:00 p.m. and continued to drive around making stops at various "hang out" points. Around 11:30 p.m.-12:00 a.m., they returned to A.P.'s house as he was having a party. E.L., C.L., and A.P. were in a bedroom when C.L. and A.P. began kissing; E.L. left the room. After C.L. reappeared, they left the house and went to three after-hours clubs. Around 4:30-4:45 a.m. they returned to C.L.'s apartment and E.L. went home. The two were meeting later that day to move C.L. into E.L.'s apartment.

{¶ 10} A.P. testified that he and C.L. had sexual relations while in his room in the early morning of April 15, 2000. Though intimate on a few prior occasions, they were mainly just friends. A.P. testified that C.L. had been dating a man from Detroit; he did not recall any other boyfriends.

{¶ 11} C.L.'s landlord on Robinwood, Theodora Wilson, testified by video deposition. Her statements regarding the day of the murder were harmonious with and testified to by Toledo Police Detective Timothy Campbell. She stated that on the date of C.L.'s murder she lived in a home on Robinwood that had an apartment in the back with a separate side entry. Wilson stated that C.L. rented the apartment and had been there less than one month when Wilson asked her to move out due to concerns over loud noises and voices.

{¶ 12} Wilson recalled that C.L.'s boyfriend helped her move in to the apartment. She described him as a large black man with a shaved head and a mustache. Wilson testified that on April 15, 2000, at approximately 4:30-5:00 a.m., she was awakened to the sound of loud music from a black car with silver trim parked across the street. The driver exited the vehicle, walked up the driveway, and rang the doorbell to C.L.'s apartment. From her kitchen window, Wilson told him to leave because she was not home. She stated that man resembled Zeke, the man who helped C.L. move into the apartment.

{¶ 13} Wilson stated that after C.L. returned home around 5:00-5:15 a.m., the man again exited his vehicle, talked with C.L., and then the pair entered her apartment. Shortly thereafter, Wilson contacted police on a noise complaint, stating that it sounded like furniture was being moved in C.L.'s apartment. When police arrived,

Wilson sent them away stating the issue had resolved. Wilsons's 911 call was played for the jury during the testimony of responding Toledo Police Officer Robert Britt.

{¶ 14} That afternoon and after repeatedly calling to her, Wilson entered C.L.'s apartment. She discovered C.L. deceased and lying naked on the living room floor. She ran down to her home and called 911. Wilson acknowledged similarities between the photograph of Zeke and the sketch and computer-generated images of Marshall.

{¶ 15} Toledo Police officer, Michael Mugler, testified that at 3:00 p.m. on April 15, 2000, he and his partner were dispatched Code 3 (red lights and sirens) and Code 18 (a deceased person) to the Robinwood address to assist the fire crews on scene. They secured the scene logging who came and went and for what purpose. C.L.'s vehicle was towed for evidentiary purposes.

{¶ 16} Mugler stated that he encountered Zeke walking down the driveway. Zeke identified himself as C.L.'s boyfriend and that he wanted to know what was happening. He was eventually transported to the police station for questioning. Zeke was cleared of any wrongdoing after initially being charged with C.L.'s murder.

{¶ 17} Detective Terry Cousino, the on-call Toledo Police investigator, photographed and videotaped the crime scene. During his testimony, the photographs and video were published for the jury and were admitted into evidence. Cousino stated that he recovered no useable fingerprints. The physical evidence collected included C.L.'s underwear which was found around her right ankle, a black bra that was around her torso, and a flowered dress that was covering her head. Cousino attended the autopsy the following day. Cousino testified that he had no further involvement in the case until reviewing it as part of the cold case unit.

{¶ 18} Lucas County Deputy Coroner Cynthia Beisser performed an autopsy on C.L. Dr. Beisser testified regarding the external and internal trauma to C.L.'s neck. Photographs documenting the injuries were admitted into evidence. Dr. Beisser swabbed multiple areas of C.L.'s body to submit for DNA testing. She testified that the toxicology report showed a very low level of alcohol and no illegal drugs in C.L.'s system. Dr. Beisser ruled that C.L.'s cause of death was strangulation and the manner of death was homicide. Her report was admitted into evidence.

**B. A.A.**

{¶ 19} Toledo Police Lieutenant Phillip Cook testified that on August 21, 2000, Toledo Police responded to a rape call at Dorr Street and Byrne Road in Toledo, Lucas County, Ohio. The victim, 17-year-old A.A., stated that when she was walking home from work an unknown individual pressed a box cutter to her throat, led her to a field behind a business, and forced her to have vaginal intercourse. A.A.

stated that the suspect wore a condom for part of the rape; the officers were able to collect the condom and wrapper from the field as evidence.

{¶ 20} A.A. described the victim as a black man, bald with a mustache, heavy set at approximately 250 pounds, and average height of 5’9” or 5’10”. Following the rape, A.A. ran to a nearby home and the resident called her grandmother who then took her to the hospital where a rape kit was completed. An unknown DNA profile was developed from the swabs in the rape kit. A.A.’s trial testimony mirrored her statements to police.

**C. S.S.-M.**

{¶ 21} On October 3, 2000, Toledo Police were dispatched to a residential backyard on Bryant Court in Toledo, Lucas County, Ohio, following the reported a rape of 13-year-old S.S.-M. S.S.-M. stated that she was walking back home from her grandmother’s house when a man grabbed her, threatened to kill her, and took her behind a house where he performed sexual acts on her including oral sex, digital, and vaginal penetration. A rape kit was performed on S.S.-M. and sent for DNA testing. A DNA profile of an unknown suspect was recovered.

{¶ 22} S.S.-M. described her assailant as brown-skinned, big mustache, bald, a big belly, dark spots, and average height. A composite sketch of the suspect was created from a facial identification catalog. It was admitted into evidence. S.S.-M.’s trial testimony was consistent with her statements to police.

**D. The Investigation**

{¶ 23} Lucas County cold case investigator Jay Gast, familiar with the case from his tenure with the Toledo Police Department, testified that in 2005, the DNA profiles in all three cases were linked to a single, unknown suspect. In 2018, after researching tools for developing suspects in cold cases, he contacted the Ohio Bureau of Criminal Investigation (“BCI”) about allocating funds to contract with a private lab to conduct genetic testing on the unknown suspect’s DNA. The tests included genetic genealogy research which essentially builds a family tree, or kinship, from the subject’s DNA and DNA phenotyping which uses DNA in conjunction with all available physical descriptors to develop a composite image, including an age progression image. The images were admitted into evidence.

{¶ 24} As to the kinship DNA research, Gast stated that to increase accuracy the company requested additional DNA samples from specific individuals. Gast testified that they obtained samples from two individuals in the Zanesville, Ohio area but that despite the development of additional leads, the subject DNA was not definitively identified. The company also identified a male, Robert Marshall, in the Chicago area.

{¶ 25} In January 2021, Gast received a call from the BCI stating that a preliminary DNA match in the cases was uploaded to the national DNA database from Indiana. Marshall was identified as the match. Gast confirmed that Marshall was in the Toledo area in 2000 and had been issued an Ohio driver's license ten days prior to C.L.'s murder. Marshall's license photo was admitted into evidence.

{¶ 26} Gast testified that on January 15, 2021, he went to Indiana, secured a search warrant, and procured buccal (or inner cheek) swabs from Marshall. The samples were returned to Toledo and placed into police property. While speaking with Marshall, Gast learned that Marshall had lived in Chicago and had relatives in Chicago; Robert Marshall, his deceased father, and his brother, also Robert Marshall.

{¶ 27} Erika Jimenez, a forensic scientist at the BCI, conducted a comparative analysis of the DNA standard from Marshall and the samples from C.L., A.A., and S.S.-M. and issued multiple reports documenting the findings. The January 20, 2021 report contained the analysis of the DNA standard from Marshall and another individual and swabs collected from the rape kit of S.S.-M. Marshall's DNA was found in the panel of S.S.-M.'s underwear. On April 19, 2021, a supplemental report was issued finding that the vaginal swabs from S.S.-M. contained Marshall's DNA.

{¶ 28} A second January 20, 2021 report analyzed three swabs collected in A.A.'s rape kit and DNA standards from Marshall another individual. Marshall's DNA was found on swabs collected from A.A.'s thigh. A follow-up report issued on April 21, 2021, included an analysis of swabs taken from the condom recovered as evidence. Marshall's DNA was found on trace debris from the condom ring.

{¶ 29} The January 27, 2021 report analyzed various swabs taken from C.L. and DNA standards from multiple subjects including Marshall. The vaginal, rectal, abdominal, and thigh swabs all contained Marshall's DNA. A subsequent report found no traceable DNA on C.L.'s dress.

**E. Jury Verdict and Sentencing**

{¶ 30} At the close of evidence, the jury convicted Marshall on all counts and sexual motivation specifications. An RVO specification hearing was held and the court found that the state met it[s] burden. As to C.L., on Marshall's aggravated murder conviction, with a sexual motivation specification, the trial court sentenced him to life in prison with parole eligibility after 20 years and an additional ten years for the RVO specification. The murder conviction merged. For rape, Marshall received a ten-year mandatory sentence with an additional ten years for the RVO. Marshall was sentenced to eight years in prison for felonious assault, with an additional ten-year term for the RVO specification.

> {¶ 31} As to Count 5, the rape relating to A.A., Marshall was ordered to serve a mandatory ten years of imprisonment and an additional ten years for the RVO specification. A nolle prosequi was entered as to Count 6, rape.
>
> {¶ 32} Finally as to Counts 7-9, involving S.S.-M., Marshall was sentenced to a mandatory sentence of ten years imprisonment on all three rape convictions with an additional ten-year imprisonment term on each for the RVO specification.
>
> {¶ 33} Marshall's sentences on Counts 1, 3, 5, 7, 8, and 9 were ordered to be served consecutively to each other and concurrent with Count 4 for a minimum sentence of 130 years. This appeal followed.

(ECF Doc. 10-1, pp. 133-42; *see also State v. Marshall* ("*Marshall I*"), 2023 WL 6390231, at *1-5 (Ohio Ct. App., Sept. 29, 2023)).

## III. Procedural History

### A. State Court Conviction

The grand jury indicted Marshall on January 14, 2021 with the following:

> AGGRAVATED MURDER-§2903.01 (B) and (F) with Specification §2941.147 and Specification §2941.149; MURDER-§2903.02(B) and (D) with Specification §2941.147 and Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149; FELONIOUS ASSAULT-§2903.11 (A)(1) and (D) with Specification §2941.147 and Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149; RAPE-§2907.02(A)(2) and (B) with Specification §2941.149

(ECF Doc. 10-1, p. 4; *id.* at pp. 5-10).

Marshall, through counsel, moved for relief from prejudicial joinder on November 5, 2021, requesting that his trials be severed. (*Id.* at pp. 19-22). The state of Ohio opposed the motion. (*Id.* at pp. 23-30). The state trial court denied Marshall's motion on January 31, 2022. (*Id.* at pp. 31-33).

A May 26, 2022 journal entry indicates that after the state of Ohio rested its case in Marshall's jury trial, his renewed motion for acquittal pursuant to Ohio Rule of Criminal Procedure 29 was denied. (*Id.* at p. 35).

On May 27, 2022, the jury found Marshall guilty of:

> Count 1, the offense of Aggravated Murder in violation of R.C. 2903:01 (B) and (F) an unclassified felony along with the attached specification of Sexual Motivation in violation of R.C. 2941.147; Count 2, the offense of Murder in violation of R.C. 2903.02 (B) and (D) an unclassified felony along with the attached specification of Sexual Motivation in violation of R.C. 2941.147; Count 3, the offense of Rape in violation of R.C. 2907.02(A)(2) and (B) being a felony of the first (1st) degree; Count 4, the offense of Felonious Assault in violation of R.C. 2903.1 l(A)(l) and (D) being a felony of the second (2nd) degree; Count 5, the offense of Rape in violation of R.C. 2907.02(A)(2) and (B) being a felony of the first (1st) degree; Count 7, the offense of Rape in violation of R.C. 2907.02(A)(2) and (B) being a felony of the first (1st) degree; Count 8, the offense of Rape in violation of R.C. 2907.02(A)(2) and (B) being a felony of the first (1st) degree; and Count 9, the offense of Rape in violation of R.C. 2907.02(A)(2) and (B) being a felony of the first (1st) degree.

(*Id.* at p. 36). On August 1, 2022, the trial court docketed an entry finding Marshall guilty of the repeat violent offender specifications attached to each count. (*Id.* at p. 37).

At his August 8 and 10, 2022 sentencing hearings, the state trial court found as follows:

> for the purpose of sentencing, count 1 and count 2 are allied offenses of similar import and therefore are merged into one. The State of Ohio elects to sentence on Count 1. It is ORDERED that defendant serve a term of life in prison with parole eligibility after 20 years as to Count 1. The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 1 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 3, all of which is mandatory pursuant to R.C. 2929. l 3(F); The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929. l 4(D)(2), and imposes a term of 10 years to be served consecutively to Count 3 that shall not be reduced. The defendant is ORDERED to serve a term of 8 years in prison as to Count 4. The defendant is ORDERED to serve a term of 10 years in prison as to Count 5, all of which is mandatory pursuant to R.C. 2929. l 3(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929. l 4(D)(2), and imposes a term of 10 years to be served consecutively to Count 5 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 7, all of which mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a

> Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 7 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 8, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count8 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 9, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 9 that shall not be reduced. . . . [T]he sentences ordered as to Counts 1, 3, 5, 7, 8, and 9 are ordered to be served consecutively to each other. The sentence ordered as to Count 4 is ordered to be served concurrently to Counts 1, 3, 5, 7, 8 and 9.

(*Id.* at pp. 38-41).

### B. Direct Appeal

Marshall filed a notice of appeal on September 13, 2022. (*Id.* at pp. 42-47). In his appellate brief, Marshall raised the following assignments of error:

> The trial court abused its discretion by denying Appellant's Motion for Relief from Prejudicial Joinder, pursuant to Crim. R. 14.
>
> The trial court abused its discretion by denying Appellant's motion for acquittal as to the charges related to victim C.L. pursuant to Crim. R. 29, because Appellant's convictions were not supported by sufficient evidence.
>
> Appellant's convictions for the charges associated with victim C.L. were not supported by the manifest weight of the evidence.
>
> The trial court abused its discretion by failing to merge all appropriate sentences on the basis of allied offenses of similar import.
>
> The trial court abused its use of consecutive sentences by imposing a 130 year (minimum) sentence which is disproportionate to the harm caused in this matter.

(*Id.* at pp. 48-81). The state of Ohio filed its appellee brief on March 22, 2023. (*Id.* at pp. 82-117). Marshall filed a reply brief. (*Id.* at pp. 118-31). On September 29, 2023, the appellate court found that "the trial court committed plain error in failing to find that felonious assault and aggravated murder are allied offenses of similar import" and remanded the case for resentencing.

(*Id.* at p. 133). The trial court's judgment was "affirmed in all other aspects." (*Id.* at pp. 132-57; *Marshall I*, 2023 WL 6390231).

Marshall appealed this decision to the Ohio Supreme Court on November 13, 2023. (*Id.* at pp. 158-60). In his memorandum in support of jurisdiction, Marshall raised the following propositions of law:

> The Sixth District Court of Appeals abused its discretion, or in the alternative, committed plain error, when it affirmed the joinder of three separate trials, and the sufficiency and/or manifest weight of the evidence submitted to the jury with regard to victim 1, by misstating the existence of third party fingerprints found at the crime scene, in its Decision and Judgment, arguably allowing a decision wherein Appellant was prejudiced by the presumption of guilt in the other matters to stand.

(*Id.* at pp. 161-73). The state of Ohio opposed jurisdiction. (*Id.* at pp. 174-88). On January 23, 2024, the Ohio Supreme Court declined jurisdiction. (*Id.* at pp. 189; *see also State v. Marshall*, 225 N.E.3d 1032 (Table)).

**C. Re-Sentencing**

On March 21, 2024, on remand from the state appellate court, the trial court resentenced Marshall as follows:

> count 1, count 2 and count 4 are allied offenses of similar import and therefore are merged into one. The State of Ohio elects to sentence on Count 1. It is ORDERED that defendant-serve a term of life in prison with parole eligibility after 20 years as to Count 1. The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 1 that shall not be reduced. The defendant is ORDERED to, serve a term years in prison as to Count 3, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 3 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 5, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929[.]14(D)(2), and imposes a term of 10 years to be served consecutively-to Count 5 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 7, all of which mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served

> consecutively to Count 7 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 8, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 8 that shall not be reduced. The defendant is ORDERED to serve a term of 10 years in prison as to Count 9, all of which is mandatory pursuant to R.C. 2929.13(F). The Court further finds the defendant is a Repeat Violent Offender under R.C. 2929.14(D)(2), and imposes a term of 10 years to be served consecutively to Count 9 that shall not be reduced. . . . [T]he sentences ordered as to Counts 1, 3, 5, 7, 8, and 9 are ordered to be served consecutively to each other.

(*Id.* at pp. 190-93).

### D. Post Resentencing Appeal

On April 1, 2024, Marshall filed a notice of appeal to Ohio's Sixth District Court of Appeals. (*Id.* at pp. 194-99). In his appellate brief, Marshall raised the following assignment of error:

> The trial court committed plain error when it assessed repeat violent offender specifications to felonies of the first degree which were not sentenced at the maximum allowable period of incarceration in violation of the pertinent RVO sentencing statute.

(*Id.* at pp. 200-17). The state of Ohio filed a responsive brief. (*Id.* at pp. 218-62). On February 21, 2025, the appellate court affirmed the trial court's judgment. (*Id.* at pp. 263-270; *see also State v. Marshall* ("*Marshall II*"), 2025 WL 573826, (Ohio Ct. App., Feb. 21, 2025)). Marshall did not appeal this decision to the Ohio Supreme Court.

## IV. Federal Habeas Corpus Petition

On June 18, 2025 , Marshall filed his federal habeas corpus petition, asserting the following Grounds for Relief:

> GROUND ONE: THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING PETITIONER'S MOTION FOR RELIEF FROM PREJUDICIAL JOINDER IN VIOLATION OF THE 5th, 6th AND 14th AMENDMENTS TO THE U.S. CONSTITUTION.

[Supporting Facts:] To prevail on his claim that the trial court erred in denying his motion to sever, the defendant has the burden of demonstrating three facts. He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313,421 N.E.2d 1288, syllabus.

"Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, *United States v. Ragghianti* (C.A. 9, 1975), 527 F. 2d 586 (two separate bank robberies without substantial identification of the perpetrator), but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense, *United States v. Catena* (C.A. 3, 1974), 500 F. 2d 1319, certiorari denied 419 U.S. 1047 (one indictment with more than 100 counts of false medical claims)." *State v. Torres* (1981) The analysis begins with a determination as to whether appellant's rights were prejudiced. A reviewing court must decide "(1) whether the evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v, Schaim,* 65 Ohio St.3d 51, 59, 1992-Ohio-3l. "If the evidence of other crimes would be admissible at separate trials, any prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials, and a court need not inquire further." *Drew v. United States* (C.A.D.C. 1964), 331 F. 2d 85, 91.

The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant had a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment." *State v. Cuny* (1975), 43 Ohio St. 2d 66, 68. "This danger is particularly high when the other acts are very similar to the charged offense or of an inflammatory nature." *Id.* "The legislature has [particularly] recognized the problems raised by the admission of other acts evidence in prosecutions for sexual offenses and has carefully limited the circumstances in which evidence of the defendant's other sexual activity is admissible." *Id. State v. Garrett,* 2009 Ohio 5442 (Ohio App. 10/13/2009), 2009 Ohio 5442 (Ohio App. 2009), ¶41-43.

The instant case is similar to *State v Kaufman,* 187 Ohio App. 3d 50, where Kaufman argued "that the evidence was not simple and distinct because the inflammatory nature of the offenses prevented the jury from being able to segregate the evidence as it applied to each victim." The Court in *Kaufman* ruled as follows: "[w]e find that Kaufman was prejudiced by the joinder of multiple victims, given the inflammatory nature of the offenses, the similar victim testimony, and the fact that the State was able to use the 'joinder test' as a back door to present an 'other acts' and propensity argument."

Appellant asks the court to find that Appellant was substantially prejudiced by the denial of his Motion for Relief from Prejudicial Joinder, which allowed three separate cold cases to be tried together.

Here, Appellant was charged with three separate rapes and one murder, all of which occurred between April and October 2000. The three victims are referred to as C.L., A.A. and S.S-M. There was testimony by different police officers for each of the cases, and two of the victims testified on their own behalf. A high school friend of C.L.'s testified on her behalf, as did her former landlady. Ultimately, the evidence against Appellant largely turned on DNA test results. This court should find that evidence from each of the separate rape cases would not have been admissible in the other cases, and that the evidence of each of these matters was not, in fact, simple and distinct.

This court should find that by trying the cases together, the court allowed the possibility of substantial prejudice due to the similarity of the alleged offenses and the inflammatory nature of the allegation.

Victim S.S-M. identified Appellant as the assailant. Victim A.A. described someone who looks something like Appellant, but did not specifically identify Appellant as her assailant (tr. 47).

In the case of C.L., this court should note that there was evidence presented of a cigarette butt at the scene which had unknown male DNA present. There was also unknown male DNA on the inside of C.L.'s dress, which Miss Jiminez, the DNA expert, testified was a difficult surface to get DNA from, but which nonetheless returned results of an unknown male contributor. Appellant's semen was present on C.L.'s body in several places; however, there was no sexual trauma.

This court should find that, particularly with respect to C.L., the court allowed the jury to potentially form the opinion that Appellant has a propensity to commit violent acts, although the most compelling evidence present as to C.L. was evidence of a non-violent sex act. The sex acts described in A.A. and S.S-M very likely substantially influenced the jury's decision with respect to C.L. Therefore, this misjoinder was prejudicial and cannot be deemed harmless. See *United States v. Lane,* 474 U.S. 438, 106 S. Ct. 725, 88 L. Ed. 2d 814, 1986 U.S. LEXIS 48, 54 U.S.L.W. 4123 (U.S. January 27, 1986)

Sex acts by themselves, are not proof of felonious assault, rape or aggravated murder. By trying the cases together, the trial court allowed the jury to infer that since Appellant had engaged in sexual conduct with C.L., he must have murdered her as well. This court should find that the evidence of Appellant's involvement in C.L.'s murder was insufficient to prove guilt beyond a reasonable doubt.

The sum total of the evidence against Appellant here is the DNA evidence found on the body. First, this could have been consensual sex; therefore, the DNA is not proof of a violent crime. Second, we do not know when CL died or how long the DNA had been present on the body. Therefore, the DNA does not prove that Appellant committed any crime. In addition, there is substantial evidence that the victim's boyfriend, "Zeke,"

could have committed the murder out of jealousy. Taken together, this court must find that Appellant's rights were prejudiced by trying all three cases together, that he provided the trial court with sufficient basis for finding that his rights would be prejudiced if the cases were not separated, and that the trial court abused its discretion by denying Appellant's "Motion for Relief From Prejudicial Joinder," pursuant to *Garrett, supra.* Then this matter must be reversed and remanded for further proceedings by the trial court.

GROUND TWO: THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PETITIONER'S MOTION FOR ACQUITTAL AS TO THE CHARGES RELATED TO VICTIM C.L. PURSUANT TO OHIO RULES OF CRIMINAL PROCEDURE 29 BECAUSE APPELLANT'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE THEREBY VIOLATING PETITIONER'S 5TH AND 14TH AMENDMENT RIGHTS.

[Supporting Facts:] "Sufficiency of the evidence is "The legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support a jury verdict.'" *State v. Thompkins,* 78 Ohio St. 3d 380, 386, 678 N.E. 2d 541 (12997) quoting Black's Law Dictionary (6 Ed. 1990) 1433. In *State v. Jenks,* 61 Ohio St. 259,574 N.E. 2d 492 (1991), the Ohio Supreme Court outlined the analysis required to apply this standard:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Williams,* 987 N.E.2d 322 (Ohio App. 2013), ¶34.

In *Jackson v. Virginia,* 443 U.S. 307, the U.S. Supreme Court wrote:

It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. The "no evidence" doctrine thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

Here, Appellant was tried for three separate rapes, and the murder of one of the rape victims, all in one trial, arguably prejudicially. At the close of the State's case, the defense used Ohio Criminal Rule 29 to move for acquittal based on insufficient

evidence having been presented to support the charges of victim C.L., and for acquittal of the charges associated with the victim A.A. due to inconsistent statements between her testimony and the DNA evidence. Ohio Crim. R. 29 states the following:

The court, on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

In the case of C.L., Appellant's semen was identified from vaginal and rectal swabs, as well as from swabs of the skin on her abdomen and leg. However, there was no vaginal trauma observed by the medical examiner. There was undisputed evidence that C.L. worked as an exotic dancer, and that she had been asked to move out of her apartment on Robinwood due to the number of men that visited her. (Deposition of Theodora Wilson (Ex. 9), p 39-40). There was also a cigarette butt found near C.L.'s body that contained unknown male DNA and C.L's dress was found to have unidentified male DNA. A fingerprint found on a cup near her body belonged to Zeke, who was C.L.'s boyfriend, according to C.L.'s longtime friend, E.L., who testified that she and C.L. had been friends since high school. E.L. explained that C.L. and her boyfriend, Zeke, were involved in a "toxic" relationship, i.e. fighting and arguments, that C.L. was trying to terminate. The pair briefly lived together; C.L. moved out but Zeke still "stalked" her. E.L. admitted that C.L. was still getting money and gifts from Zeke that she would procure by occasionally having sex with him.

Ms. Theodora Wilson, the homeowner of the Robinwood residence, and C.L.'s landlady, testified during her deposition (Ex. 9) that she saw a black male approach C.L.'s apartment at about 4:30 in the morning of the day she died, and that the male was the same person who had helped C.L. move into her apartment three weeks prior. She testified that she told the police at the time that the person she saw in the early morning hours of April 15, 2000 goes by the name of "Zeke."

Taken together, this court should find that the evidence adduced at trial as regards counts 1 through 3 (aggravated murder, rape with RVO specifications, and felonious assault with specifications) was simply insufficient for submission to the jury as regards allegations against Appellant concerning C.L. Thus, this court must remand this matter for further proceedings, at least as regards counts 1 through 3.

In *Travillion v. Superintendent Rockview SCI,* 982 F.3d 896, 2020 U.S. App. LEXIS 39554, 2020 WL 7349235 (3d Cir. Pa. December 15, 2020), the Third Circuit Court of Appeals found that "Habeas relief was proper because it was objectively unreasonable for the Pennsylvania court to apply the *Jackson v. Virginia* standard and deny relief on petitioner's sufficiency of evidence claim

where the only evidence linking him to the robbery was fingerprint evidence on the easily movable manila folder and paper carried into the store by the robber, there was no evidence as to when the prints were placed on the folder and paper, and the store manager's physical description of the perpetrator did not match petitioner's characteristics."

In the instant case, as in *Travillion,* the evidence against appellant at trial was very weak. There was DNA evidence and a landlady who did not identify the appellant, but instead identified another suspect, the victim's boyfriend, Zeke. The landlady's conversation went as follows (Deposition Transcript Pg. 36):

Q. How would you characterize that particular person? Did he have a bald head?
A. Yes, he had a bald head, mustache.
Q. And was that -
A. They were very muscular.
Q. And is that how you would describe Zeke?
A. That's how I would describe Zeke.
Q. Now, I want to hand you a sketch that was done by a member of the Toledo Police Department and marked State's exhibit Number 7. Thank you, Will.
A. Yes.
Q. Does it look similar?
A. He has a round head, very round head. He had a mustache. His hair is -
Q. In your opinion, ma'am, is that, that sketch similar to the photograph in State's exhibit 6?
A. It's-similar.
Q. Okay. That's all we need to know, what your opinion is.

The above excerpt is from the deposition of the landlady. The following is an excerpt from Appellant's defense counsel during closing arguments: "Now, ladies and gentlemen, you've seen the picture of Mr. Marshall, you've seen the picture if Izell Brown, they don't look alike. One of the big things, he's bald. Look at the picture of Mr. Marshall from April of 2000. He has hair. Not shaved, he has hair."

As should be clear from the above excerpts, the landlady never identified Appellant at all. She identified another possible perpetrator, Zeke. Zeke was bald, Appellant had a full head of hair. (See State's exhibit 40, Ohio Driver's License. See Also Trial Transcript pg. 662) Therefore, we urge this Court to find that it was objectively unreasonable to apply the *Jackson v. Virginia* standard. We urge this court to grant habeas relief.

GROUND THREE: APPELLANT'S CONVICTIONS FOR THE CHARGES ASSOCIATED WITH THE VICTIM C.L. WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE, A VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION.

[Supporting Facts:] This court should find that the convictions for murder, rape and felonious assault as to the victim C.L. were against the manifest weight of the evidence.

"Under a manifest-weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony." *State v. Thompkins* (1997), 78 Ohio St. 3d 380,387,678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated by *State v. Smith* (1997), 80 Ohio St. 3d 89, 684 N.E.2d 668. The appellate court, 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215,485 N.E.2d 717." *State v. Jackson,* 863 N.E.2d 223, 169 Ohio App. 3d 440, 2006 Ohio 6059 (Ohio App. 2006)

A brief overview of the evidence will demonstrate that the defendant, Marshall, was not the most likely perpetrator of the crime against the C.L.: There was testimony of a second black male seen entering C.L.'s apartment in the early morning hours of April 15, 2000. Ms. Wilson, the landlady, was awakened by the loud music in his car (deposition, p. 25), and stayed awake long enough to see C.L. come home and Zeke enter her apartment alongside her. Then Ms. Wilson went back to bed. Ultimately, Zeke was excluded as the source of the DNA found on C.L.'s body. On that basis, apparently, the murder charges initially brought against Zeke were dropped.

There was no evidence presented indicating if the skin swabs were taken on C.L.'s neck where she was strangled, and there were no tests run on any scrapings from under C.L.'s fingernails, as might be expected in the case of a violent death where the victim might have attempted to defend herself. There was also no evidence on as to the size of Appellant's hands as compared to the bruises and contusions on C.L.'s neck, as an example, to connect Appellant with the murder in some way.

Importantly, there were other items found in the apartment near the body. A drinking cup was found that showed one fingerprint belonging to Izell Brown (Tr. P. 671 ), a.k.a. 'Zeke,' and a cigarette butt with a mixture of DNA from both C.L. and an unidentified male (tr. P. 672). Also, a swab of C.L.'s dress revealed unknown male DNA.

Taken together, all of this evidence shows that Appellant was not the most likely perpetrator of the rape and murder of C.L., and that therefore, Appellant's convictions were not supported by the manifest weight of the evidence. This court should reverse and remand this matter for a new trial.

GROUND FOUR: THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO MERGE ALL APPROPRIATE SENTENCES ON THE BASIS OF ALLIED OFFENSE OF SIMILAR IMPORT IN VIOLATION OF THE 5TH, 6TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION.

[Supporting Facts:] The felonies against the victim C.L. (Count 1, Aggravated Murder, R.C. 2903.0l(B)&(F) and Count 3, Rape, R.C. 2907.02(A)(2) & (B)) constituted one continuous bad act committed by the appellant with one animus, specifically causing the death of C.L. while committing rape. Thus, the trial court abused its discretion by failing to merge those sentences on the basis of allied offenses of similar import.

Similarly, this court should also find that the multiple sex acts for which Appellant was convicted involving victim S.S.-M (Count 5, Rape, R.C. 2907.02(A)(2) & (B) and Count 7, Rape, R.C. 2907.02(A)(2) & (B)) also constituted one bad act, committed with one animus, specifically sexual gratification, which resulted in one harm, which was the rape of S.S.-M.

Thus, this court should find that the trial court abused its discretion by failing to merge those sentences on the basis of allied offenses of similar import.

The trial court's failure to merge these sentences violated appellant's 5th and 14th Amendment prohibition against being deprived of life, liberty, or property due process of law, as well as the 5th amendment prohibition against being twice put in jeopardy of life or limb for the same offence.

GROUND FIVE: THE TRIAL COURT ABUSED ITS USE OF CONSECUTIVE SENTENCES BY IMPOSING A 130-YEAR (MINIMUM) SENTENCE WHICH IS DISPROPORTIONATE TO THE HARM CAUSED IN THIS MATTER IN VIOLATION OF THE 5th, 8th, and 14th AMENDMENTS TO THE U.S. CONSTITUTION.

[Supporting Facts:] The Ohio supreme Court considered the matter of consecutive sentences in the case of *State v. Gwynne,* 2022-Ohio-4607 (Ohio 2022).

"R.C. 2929.14(C)(4) requires trial courts to consider the overall number of consecutive sentences and the aggregate sentence to be imposed when making the necessity and proportionality findings required for the imposition of consecutive sentences. We also hold that appellate review of consecutive sentences under R.C. 2953.08(g)(2) does not require deference to the trial court's findings under R.C. 2929.14(C)(4)"

In *Gwynne,* the defendant pled guilty to a number of non-violent felonies including "17 counts of second-degree burglary, 4 counts of third-degree theft, 10 counts of fourth-degree theft, and 15 misdemeanor counts of receiving stolen prope1ly." At sentencing, the trial court imposed all sentences consecutively, for a total of 65

years. *Gwynne* supra ¶5. The Fifth District Court of Appeals affirmed the sentence, finding that "no authority exists for this court to vacate some, but not all, of Gwynne's consecutive sentences." Id, ¶9. The Supreme Court reversed the judgment of the Fifth District Court of Appeals and remanded it for the court to consider whether the record "clearly and convincingly does not support the consecutive-sentencing findings under R.C. 2929.14(C)(4), as they pertain to the sentencing court's order of consecutive sentences on each count.

"Liberally construing R.C. 2929.14(C)(4) and giving it a more just and reasonable construction leads the Ohio Supreme Court to determine that sentencing courts must consider whether the consecutive terms the court intends to impose are necessary to protect the public and whether those terms are proportionate to the defendant's conduct, not whether any hypothetical consecutive sentence might be necessary or proportionate. Accordingly, authority exists for an appellate court to vacate some-but not all—of the consecutive sentences that a trial court has imposed. This authority exists within the language of R.C. 2929.14(C)(4) and R.C. 2953.08(0)(2). All that is required pursuant to R.C. 2953.08(0)(2) is that the appellate court clearly and convincingly find that the record does not support the trial court's necessity or proportionality findings in light of the actual number of consecutive terms that it imposed and the resulting aggregate sentence. "Gwynne, supra, ¶7.

In the instant case, the trial court stated on page 2 of the Journal Entry that "[b]eing necessary to fulfill the purposes of R.C. 2929.11 and 2929. l 4(C)(4), consecutive sentences are necessary to protect the public from future crime or to punish the offender and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The court further finds that the harm caused was so great to each victim or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct, and the defendant's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime, therefore the sentences ordered as to Counts 1,3,4,7,8, and 9 are ordered to be served consecutively to each other. The sentence ordered as to Count 4 is ordered to be served concurrently to counts 1,3,5,7,8 and 9."

The issue now is whether the consecutive sentences ordered in this matter are really necessary to protect the public, and whether they are proportionate to Appellant's conduct. Appellant was 55 years old on the day of his sentencing (d.o.b. 11/22/1966), and is 58 now.

This court should find that while some of the consecutive sentences may be warranted here, the aggregate total sentence is wholly excessive. This court should find that the record does not support the trial court's necessity and proportionality findings in light of the actual number of consecutive terms that it imposed and the resulting aggregate sentence" (*Gwynne,* supra, ¶l 7) in ordering a 130 year minimum sentence, and find that the consecutive sentences ordered here are more

than is necessary to protect the public from future crime or to punish the offender, and is therefore disproportionate to the seriousness of Appellant's conduct and the danger posed to the public.

In a case very similar to the instant case, *Whalen v. United States,* 445 U.S. 684, 100 S. Ct. 1432, 63 L. Ed. 2d 715, 1980 U.S. LEXIS 1):

Defendant was convicted of rape and of felony murder in commission of the rape. He was sentenced to two consecutive terms, as provided for each of the crimes. The appellate court affirmed the convictions, and defendant sought further review. The court considered defendant's claim that his sentence for the offense of rape must be vacated because the offense merged for the purpose of punishment with the felony murder offense. The court concluded that the lower court erred in believing that Congress authorized consecutive sentences under the circumstances of this case. The court looked to D.C. Code § 23-112, which provided that multiple punishments could not be imposed for two offenses arising out of the same criminal transaction unless each offense required proof of a fact which the other did not. In this case, the conviction for murder committed in the course of a rape would not have been possible without proving the elements of rape. In this case, rape was thus a lesser-included offense of felony murder, not a separate offense.

The U.S. Supreme Court offered this further clarification:

[m]ultiple punishments could not be imposed for two offenses arising out of the same criminal transaction unless each offense "requires proof of a fact which the other does not," such not being the case with respect to rape and to a killing committed in the course of the rape, because a conviction for killing in the course of rape cannot be had without proving all the elements of the offense of rape. *(Whalen, supra)*

The U.S. Supreme Court reversed the judgment in *Whalen,* and remanded to the lower court.

In the instant case, defendant was also convicted of a murder during the course of a rape, yet in the instant, the Sixth District Court of Appeals ruled that the defendant *could* be sentenced twice and consecutively for a murder during a rape. This violates defendant's rights under the Fifth Amendment to the U.S. Constitution to be safe from double jeopardy, as well as defendant's Fifth and Fourteenth Amendment rights to due process of law.

It is also important to note that the crimes of which this petitioner is accused all occurred in 2000. Petitioner was not arrested until 2021. During those intervening 21 years, petitioner had no criminal history, not even a parking ticket. It is therefore difficult to claim and a stretch of the imagination that petitioner needs consecutive sentences to protect the public. Clearly, he does not pose much of a threat to the

> public given that he was a free man for 21 consecutive years and a productive member of society who was not accused of any crimes during that time.
>
> This Court should reverse defendant's consecutive sentences for rape and murder and remand to the lower court for resentencing.

(ECF Doc. 1, pp. 4-18).

## V. Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104-132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to Marshall's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336, (1997). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, (2011). This is so because "[s]tate courts are adequate forums for the vindication of federal rights" and AEDPA thus acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19, (2013). As such, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455, (2005) (internal citation and quotation omitted).

Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181, quoting 28 U.S.C. §§ 2254(a), (b), (c). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application

> shall not be granted . . . unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

First, clearly established federal law for purposes of AEDPA review includes "the holdings, as opposed to dicta, of [U.S. Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to U.S. Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court despite both cases having materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), cert. denied, 549 U.S. 1047 (2006). However, a state court does not act contrary to clearly established federal law where U.S. Supreme Court precedent is ambiguous or otherwise unavailable. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision is an unreasonable application of Supreme Court precedent where the state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), cert. denied, 531 U.S. 1089, (2001). Under § 2254(d)(2), a state court's factual determination will stand unless it is objectively unreasonable in light of the evidence presented in state court. *Harrington*, 562 U.S. at 100. "[A] federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Next, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). And, as the U.S. Supreme Court has repeated, "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion . . . ." *Burt*, 571 U.S. at 18. Federal courts must also defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier,* 477 U.S. 478, 491, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29, (1982).

In all, federal habeas corpus relief is a "guard against extreme malfunctions in the state criminal justice systems," and is different in kind from the relief available in direct appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133, (2022) (internal quotation omitted). Thus, to obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("When the state court has not assessed the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

## VI. Procedural Barriers

Before coming to federal court, a state habeas petitioner must overcome certain procedural barriers, including exhaustion of state remedies and procedural default. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). A federal court sitting in habeas review may review claims that were evaluated on the merits by the state court. But claims that were not evaluated by a state court, either because they were never fully presented to the state court (i.e., state court remedies were unexhausted) or because they were not properly presented to the state court (i.e., they are procedurally defaulted) are not available for federal habeas corpus review. *Bonnell v. Mitchel,* 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004), *aff'd sub nom. Bonnell v. Mitchell*, 212 F. App'x 517 (6th Cir. 2007).

### A. Exhaustion

A petitioner must first give the state courts a "*fair*" opportunity to act on his claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). For a claim to have been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have been raised at each and every stage of state review. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). It is not enough for the claim raised in state court to be "somewhat similar" to the one raised in the habeas petition or implicate the same facts; the state court must have been called upon to apply the legal principles of the claim now presented to the federal courts. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011).

The petitioner also must have presented their "claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Williams v. Anderson*, 460

F.3d 789, 807 (6th Cir. 2006) (quotation marks omitted). In this Circuit, this can be done in one of four ways:

> (1) reliance upon federal cases employing constitutional analysis;
>
> (2) reliance upon state cases employing federal constitutional analysis;
>
> (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or
>
> (4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (paragraph breaks added).

Failure to exhaust occurs where state court remedies are still "available at the time of the federal petition." *Williams*, 460 F.3d at 806. This failure to exhaust can also lead to a petitioner procedurally defaulting his claims. If the petitioner has not fully utilized his state remedies and has no legal mechanism by which to do so now, the claim he failed to present is procedurally defaulted, and this Court cannot act on the claim either. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams*, 460 F.3d at 809.

**B. Procedural Default**

The procedural default doctrine limits federal review if the petitioner has failed to follow the state's procedural requirements for presenting his or her claim in state court. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Thus, a federal habeas court will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and

is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

This Circuit consults a four-part test to determine whether a petitioner has procedurally defaulted a claim. A petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves to permit review in limited circumstances. A petitioner can obtain review of procedurally defaulted claims if he or she shows: (1) "cause," i.e. that some external factor kept him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," i.e. that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different verdict would have resulted if the alleged constitutional violation hadn't occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if the procedurally defaulted claim is based on new evidence that the petitioner was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."). But "actual[] innocen[ce]" means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623

(1998). To overcome procedural default, an actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## VII. Discussion

### A. Ground One – Joinder of Cases for Trial

In his first ground for relief, Marshall argues that his 5th, 6th, and 14th amendment rights were violated when the state trial court denied his motion for relief from prejudicial joinder resulting in the murder and rapes charges being tried together. (ECF Doc. 1, pp. 4-8). Respondent argues that this ground is procedurally defaulted because Marshall did not fairly present it to the state courts. (ECF Doc. 10, p. 16). As Respondent asserts, Marshall raised a similar issue in his direct appeal, but the error was presented solely on state law grounds and "Marhsall failed to apprise the Ohio courts of the constitutional nature of his claim." (*Id.*). In his Traverse, Marshall argues globally that "[a]ny claim that was not exhausted in state court, and any claim that was defaulted for procedural reasons should be allowed to pass through the procedural gateway and be evaluated on the merits" because he "is innocent of the crime of murder. Therefore this is a case of actual innocence." (ECF Doc. 12, p. 2). He further contends that he "was only found guilty because of multiple constitutional violations that occurred at trial. Therefore this is a miscarriage of justice." (*Id.* at p. 3). I agree with Respondent and find that Marshall failed to fairly present this issue to the state courts, the time to do so has passed, and that Marshall has not excused his default or made a showing of actual innocence.

As provided above, a habeas petitioner must first give state courts a fair opportunity to review their claims. *See, e.g., O'Sullivan*, 526 U.S. at 844. To fairly present a claim in state court and preserve the matter for federal habeas review, the petitioner must provide the state court with the basis for his claim in a way that alerts the state court of the alleged federal constitutional

error. *See, e.g., Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 276 (1971). This is because "[s]tate courts, like federal courts, are obliged to enforce federal law." *O'Sullivan*, 526 U.S. at 844. Therefore, "state courts should have the first opportunity to review [a petitioner's] claim and provide any necessary relief." *Id*.; *see also Shinn v. Ramirez,* 596 U.S. 366, 378 (2022) ("Exhaustion affords States an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights . . . .") (internal quotations and marks omitted).

In his first ground for relief, Marshall argues that the state trial court violated his constitutional rights when it denied his motion for relief from prejudicial joinder. (ECF Doc. 1, pp. 4-8). However, a review of his appellate brief before Ohio's Sixth District Court of Appeals reveals that he did not raise this issue arguing the constitutional violations that he raises here. (*See* ECF Doc. 10-1, pp. 63-65). Rather, the issue is raised in terms of violations of state law. (*Id.*). Therefore, the state appellate court was not given the opportunity to first rule on the alleged constitutional claims and thus they were not fairly presented and now are procedurally defaulted.

Furthermore, Marshall's actual innocence argument is not well taken to excuse his default. Again, "actual[] innocen[ce]" means "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. And Marshall must support this claim with "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). No new reliable evidence proving his innocence has been presented, instead Marshall simply asserts that he is innocent of the crime of murder. Such a proclamation does not suffice. Accordingly, I find that he has not excused his default. I therefore recommend that the District Court dismiss Ground One as procedurally defaulted.

**B. Ground Two – Sufficiency of the Evidence**

In his second ground for relief, Marshall argues his convictions for charges related to victim C.L. were not supported by sufficient evidence. (ECF Doc. 1, pp. 8-12). Respondent contends that the "state appellate court's reasonable decision rejecting this ground is entitled to AEDPA deference." (ECF Doc. 10, p. 32). In his Traverse, Marshall claims he was

> convicted of the murder of C.L. based on three pieces of evidence: 1) the presence of his DNA inside and on the victim . . . 2) an eye-witness who clearly said they saw someone other than Marshall enter the apartment where the body was found; and 3) an identification based upon an unconstitutionally suggestive witness identification technique . . . .

(ECF Doc. 12, p. 7).

To the extent Marshall attempts to raise a new constitutional claim in his Traverse regarding the "unconstitutionally suggestive witness identification technique," I find such argument waived as petitioners cannot raise new grounds in the Traverse. In his Petition, Marshall challenges the sufficiency of evidence lodged against him and makes arguments related to a witnesses identification of him, but does not make the argument in the constitutional terms raised in his Traverse. (*See e.g.,* ECF Doc. 1, p. 11). "The law is quite clear that arguments presented for the first time in a traverse are waived." *Franklin v. Marquis*, No. 5:17-cv-2002, 2019 WL 11816553, at *20 n.12 (N.D. Ohio Oct. 31, 2019), *report and recommendation adopted*, 2021 WL 861614.

Regarding the sufficiency issue, the due process clause requires the State prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). In *Jackson v. Virginia,* 443 U.S. 307 (1979), the Supreme Court established the standard for reviewing constitutional claims challenging the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

> elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Id.* at 319. Otherwise stated, a petitioner is entitled to habeas corpus relief if, based on the record evidence at trial and in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id*. at 324. The Sixth Circuit has aptly described this standard as imposing a "'nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Furthermore, the state does not have an "affirmative duty to rule out every hypothesis except that of guilty beyond a reasonable doubt." *Id.* at 326. Under this standard, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*

On federal habeas review of a claim challenging the sufficiency of the evidence, courts are bound by two layers of deference. First, in determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the federal court does not reweigh the evidence, reevaluate the credibility of witnesses, or otherwise substitute its opinion for that of the trier of fact. *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009). Thus, even if the federal court might not agree with the trier of fact's decision to convict, it must uphold the determination if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. *Id.* The second layer of deference, required under AEDPA, extends to the state appellate court's determination so long as it is not unreasonable. *See Tucker v. Palmer,* 541 F.3d 652, 656 (6th Cir. 2008); *see also* 28 U.S.C. § 2254(d)(2). Additionally, as described above, comity principles require federal courts to defer

to a state's judgment on issues of state substantive and procedural law, *see Murray v. Carrier*, 477 U.S. 478, 491 (1986), and federal courts must accept a state court's interpretation of state law and its rules of practice, *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

Here, the Ohio Sixth District Court of Appeals analyzed this issue as follows:

> {¶ 46} In his second and third assignments of error, Marshall argues that his convictions relating to C.L. (Counts 1-4) are based on insufficient evidence and are against the manifest weight of the evidence.
>
> {¶ 47} "Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 6th Dist. Erie No. E-21-018, 2022-Ohio-1973, ¶ 73. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when reviewing a manifest weight claim,
>
> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).
>
> {¶ 48} Marshall was convicted of the aggravated murder, murder, rape, and felonious assault of C.L., with RVO specifications. In 2000, aggravated murder, in violation of R.C. 2903.01(B) and (F), provided: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, * * * rape, * * *." Murder with a sexual motivation is established by proof that a person caused the death of another as a proximate result of the offender's committing or attempt to commit a violent first or second-degree felony. R.C. 2903.02(B) and (D). Rape, R.C. 2907.02(A)(2) and (B), prohibits an individual from threatening or physically forcing an individual to engage in sexual conduct. Finally, felonious assault, R.C. 2903.11(A)(1) and (D), prohibits knowingly causing serious physical harm to another.
>
> {¶ 49} Marshall argues that the evidence supporting the charges as to C.L. were insufficient to submit to a jury because although Marshall's DNA was found on C.L. both externally and internally, there was no evidence of trauma which is indicative of force. Marshall emphasizes C.L.'s work as an exotic dancer, her various male visitors, and the testimony of C.L.'s landlord's that her boyfriend,

> Zeke, who had helped her move in three weeks prior, was the same man who came to C.L.'s door in the early morning of April 15, 2000. Marshall incorporates the same arguments in support of his claim that his convictions were against the manifest weight of the evidence.
>
> {¶ 50} Contrary to Marshall's assertions, there is sufficient evidence demonstrating that he raped and killed C.L. The DNA evidence clearly demonstrates that Marshall had sexual contact with C.L. The analysis of the vaginal and rectal swabs taken from C.L. showed no other male contributors. Next, how C.L. was found—with her dress around her neck, bra around her waist, and underwear around her ankle—evidences a forced act. Further, the noise from the apartment around the time of the murder was loud enough for the landlord to call the police. As to identity, while the landlord testified that the suspect looked like Zeke after reviewing photos and sketches, she admitted that Marshall and Zeke looked similar.
>
> {¶ 51} Viewing all the evidence presented at trial in a light most favorable to the state, a rational juror could have found the elements of each charge in Counts 1-4 proven beyond a reasonable doubt. Additionally, the evidence presented does not establish that the jury lost its way resulting in a manifest miscarriage of justice. Marshall's second and third assignments of error are not well-taken.

*Marshall I*, 2023 WL 6390231, at *7-8.

Upon review, I find nothing in the court's analysis supports a conclusion that it unreasonably applied federal law or Supreme Court precedent, nor did it unreasonably determine the facts in light of the evidence presented at trial. Marshall's argument on habeas review simply reiterates his disagreement with how the factfinder determined the facts of his case. Applying the double deference required, I find that a rational trier of fact could have found Marshall guilty and the state's determination on appeal was reasonable. Accordingly, I recommend that the District Court deny Ground Two.

**C. Ground Three – Manifest Weight of the Evidence**

In his third ground, he argues the convictions regarding victim C.L. were against the manifest weight of the evidence. (*Id.* at pp. 12-14).

A claim that a conviction is against the manifest weight of the evidence arises solely under state law and is not cognizable in federal habeas corpus. *Johnson v. Havener*, 534 F.2d

1232, 1234 (6th Cir. 1976). A manifest-weight claim asks a reviewing court to weigh the evidence, assess witness credibility, and determine whether the factfinder lost their way; it does not present the federal due process inquiry established in *Jackson v. Virginia*, 443 US. 307, 319 (1979). The Sixth Circuit has, however, indicated it may be appropriate to liberally construe a pro se petitioner's petition to construe a manifest weight argument as a sufficiency of the evidence argument where the state court's determination necessarily included a finding of sufficient evidence. *Nash v. Eberlin*, 258 F. App'x 761,764 n.4 765 (6th Cir. 2007). I find liberal construction unnecessary here because Marshall raised a sufficiency of the evidence argument which this Court addressed in Ground Two. *See Nash v. Eberlin*, 258 F. App'x 761, 764 n. 4 (6th Cir. 2007). Therefore, I recommend that the District Court dismiss Ground Three as not cognizable.

**D. Ground Four – Allied Offenses**

In his fourth ground, Marshall argues his constitutional rights were violated when the state trial court failed to merge all appropriate sentences that stemmed from allied offenses. (ECF Doc. 1, pp. 14-15). Respondent contends that Ground Four is procedurally defaulted under *Maupin*. (ECF Doc. 10, p. 19). According to Respondent "[t]he appellate court reviewed the issue of allied offenses for plain error because Marshall did not raise an objection at trial" and the application of a plain error review is the state appellate court enforcing a procedural rule against Marshall (*Id.*). Pursuant to *Maupin*, I agree with Respondent and recommend that the District Court dismiss Ground Four as procedurally defaulted.[2]

---

[2] I note that, in reviewing for plain error, the state appellate court did find error with respect to the trial court's failure to merge Marshall's convictions for felonious assault and aggravated murder for purposes of sentencing. *Marshall I*, 2023 WL 6390231, at *10. Because the court remedied this issue on appeal, it is not raised on habeas review to this Court and likewise will not be discussed. Accordingly, I proceed to review Marshall's allied offenses arguments with respect to the rape and murder charges related C.L. and the rape charges related to S.S.-M.

The first *Maupin* prong is met because Marshall failed to comply with Ohio's contemporaneous objection rule. In Ohio, a criminal defendant must make a contemporaneous objection to an alleged trial court error at the trial court level or forfeit the claim for appellate review. *State v. Rogers*, 38 N.E.3d 860, 866 (Ohio 2015); see also *Osborne v. Ohio*, 495 U.S. 103, 124 (1990) (recognizing Ohio's contemporaneous objection rule). Appellate courts can only review a forfeited claim under a deferential "plain error" standard. *Rogers*, 143 Ohio St.3d at 391-92; Ohio Crim. R. 52(b).

As to the second *Maupin* prong, the state appellate court enforced the contemporaneous objection rules against Marshall when it reviewed this claim for plain error in his direct appeal. On appeal, Marshall raised an assignment of error alleging that several of his convictions should have merged for purposes of sentencing, and the appellate court acknowledged that the applicable state statute, "R.C. 2421.25 codifies the constitutional protections of the Double Jeopardy Clause," however "[b]ecasue Marshall did not raise the issue of merger or otherwise object to the trial court's imposition of the sentences he . . . forfeited all but plain error." *Marshall I*, 2023 WL 6390231, at *8-9. The court found as follows with respect to the violations alleged on habeas review:

> {¶ 58} Here, as to C.L., Marshall argues that the rape, felonious assault, aggravated murder, and murder were one continuous bad act with the sole animus being C.L.'s death. As to the rape and aggravated murder counts, the evidence demonstrates that they were committed with a separate animus. C.L. was found with her clothing partially removed and Marshall's semen was found in her vagina and anus. There was no evidence of any genital trauma resulting from the rape or that the rape in any way contributed to C.L.'s death. C.L. died from manual strangulation lasting several minutes. Thus, the acts were committed separately and with different instrumentalities. Upon review, in this case the offenses of rape and aggravated murder do not merge.
>
> {¶ 59} Marshall similarly argues that his felonious assault and aggravated murder convictions stem from a single act and should have been merged at sentencing. The

> state argues that the coroner's testimony as to the contusions to C.L.'s face and neck suggests that she suffered two independent harms.
>
> . . .
>
> {¶ 62} As to S.S.-M., Marshall contends that his rape convictions for vaginal rape, digital penetration, and oral sex were one continuous act, with a single animus and constitute allied offenses of similar import. Ohio law is clear that "multiple separate and distinct acts of penetration will support multiple convictions and sentences, and oral, anal, and vaginal rapes constitute separate and distinct acts." *State v. Hall*, 6th Dist. Lucas No. L-17-1069, 2018-Ohio-619, ¶ 10, citing *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 48; *State v. Pippin*, 1st Dist. Hamilton Nos. C-160380, C-160381, 2017-Ohio-6970, ¶ 49.
>
> {¶ 63} At trial, S.S.-M. testified that Marshall performed oral sex on her, he digitally penetrated her vagina, and he inserted his penis in her vagina. Because these were separate acts, Marshall has failed to demonstrate entitlement to the protections against multiple punishments for the offenses relating to S.S.-M.

*Marshall I*, 2023 WL 6390231, at *9-10. The court concluded that Marshall failed to demonstrate error with respect to these issues. *Id.*

Next, under *Maupin*, I look to whether the procedural rule enforced is an independent and adequate state ground to deny federal habeas review. The Sixth Circuit has found that the contemporaneous objection rule is an adequate and independent basis to deny federal habeas review. *See Scott v. Mitchell*, 209 F.3d 854, 873 (6th Cir. 2000); *Saxton v. Forshey*, No. 22-3752, 2023 WL 2368818, at *3 (6th Cir. 2023) (finding that an Ohio appellate court's review of a double jeopardy claim for plain error was the enforcement of a procedural rule.).

Accordingly, the first three *Maupin* prongs have been met because Marshall did not comply with the contemporaneous objection rule when he did not object to the imposition of multiple sentences at sentencing, the state appellate court enforced the rule when it reviewed his double jeopardy assignment of error for plain error, and the contemporaneous objection rule is an adequate and independent basis to deny federal habeas review.

Turning to the final *Maupin* prong, whether the petitioner can show cause and prejudice to excuse the default, Marshall has not argued cause or prejudice regarding his failure to object to the trial court's imposition of multiple sentences to excuse the default. As mentioned above, Marshall asserts that he is actually innocent in his Traverse but does not call this Court's attention to new evidence in support of this proclamation. Accordingly, all four prongs of the *Maupin* analysis are met, and I recommend that the District Court dismiss Marshall's fourth ground for relief as procedurally defaulted.

**E. Ground Five – Consecutive Sentences**

In his final ground, Marshall claims that his constitutional rights were violated when his sentences were ordered to be served consecutively. (ECF Doc. 1, pp. 15-18). Respondent asserts that this ground is procedurally defaulted because Marshall failed "to fairly present it the Ohio courts as a constitutional violation." (ECF Doc. 10, p. 19). On direct appeal, this issue was presented as solely an issue of state law and thus was not raised in the constitutional context raised before this Court. (*Id.* at p. 20). As stated above, in the Traverse, Marshall argues globally that "[a]ny claim that was not exhausted in state court, and any claim that was defaulted for procedural reasons should be allowed to pass through the procedural gateway and be evaluated on the merits" because he "is innocent of the crime of murder. Therefore this is a case of actual innocence." (ECF Doc. 12, p. 2). I agree with Respondent and find that Marshall failed to fairly present this issue to the state courts, the time to do so has passed, and his that Marshall has not excused his default or made a showing of actual innocence.

A review of Marshall's appellate brief reveals he argued error with respect to the imposition of consecutive sentences solely on state law grounds. (*See* ECF Doc. 10-1, pp. 72-75). Therefore, the state appellate court was not given the opportunity to first rule on the alleged

constitutional claims and thus they were not fairly presented and now procedurally defaulted. Furthermore, as stated above, Marshall does not excuse this default and has not brought the Court's attention to any new evidence that demonstrates his actual innocence. Accordingly, I find that he has not excused his default. I therefore recommend that the District Court dismiss Ground Five as procedurally defaulted.

## VIII. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this Court will grant a certificate of appealability ("COA") for an issue raised in a Section 2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); see also *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

If the District Court accepts my recommendations, Marshall will not be able to show that reasonable jurists could disagree with the District Court's resolution of his sufficiency of the evidence claim because Marshall did not establish how the state court improperly applied federal law or Supreme Court precedent nor did he demonstrate that the court unreasonably determined the facts in light of the evidence produced at trial. The dismissal of his first, third, fourth, and fifth grounds is not debatable among jurists. Marshall will not be able to show that the dismissal of these grounds is improper as grounds one and five were not fairly presented, ground three is not cognizable, and ground four was defaulted pursuant to *Maupin*. Furthermore, Marshall has

not demonstrated cause or prejudice to excuse his defaults. I therefore recommend that no certificate of appealability issue in this case.

## IX. Recommendation

For the reasons provided above, I recommend that Marshall's Petition for a writ of habeas corpus be denied as to Ground Two and dismissed as to Grounds One, Three, Four, and Five. I further recommend that he be denied a certificate of appealability.

Dated: September 29, 2026

REUBEN J. SHEPERD
UNITED STATES MAGISTRATE JUDGE

---

**OBJECTIONS**
**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary

to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).